Guadarrama and Jefferson. Mr. Boss, I believe you're opening. Yes, your honor, that's correct. May it please the court. My name is Ed boss, and I represent Officer Jeremiah Guadarrama, who's the appellant in this case. This court should reverse the district court's orders, because well, because Officer Guadarrama is entitled to qualified immunity as a matter of law. Therefore, the court should render judgment and Guadarrama's favor. The facts of the case, you know, an appeal from a denial of a motion to dismiss under Rule 12 B six are taken from the amended complaint in this case. And in this case, beginning on page 217 of the record, in paragraph 12 of the amended complaint, the first sentence says on July 10 2017, Mr. Olivas, who was plaintiff's decedent, was at home telling family members that he would kill himself lighting himself on fire after dousing himself with gasoline. In paragraph 15, we read that Mr. Olivas, his son, Anthony called the police said that his father was threatening suicide and threatening to burn down the house and was pouring gasoline in the house. In paragraph 19, we're here another we read about another Arlington police officer who was dispatched to the house regarding an alleged suicidal suspect high on methamphetamines, pouring gasoline inside the house, beginning on record page 220. And from paragraphs 20 through 29, we are provided Guadarrama's Officer Guadarrama's account of the facts. He was dispatched to the  with gasoline. He went into the home with Sergeant Jefferson and another officer Elliot. Guadarrama quickly detected a strong odor of gasoline. He heard loud voices and went to a bedroom down the hall and saw Mr. Olivas and was concerned that he would ignite himself and others because he smelled a very strong odor of gasoline in the bedroom. Officer Guadarrama saw Mr. Olivas pour gasoline on himself on top of his head with his left hand while holding a lighting mechanism in his right hand. Officer Guadarrama saw a female in the room who was in close proximity to him. She would not and did not leave the room after several commands. Officer Guadarrama considered firing his revolver at Mr. Olivas to immobilize him, but he was concerned that the bullet could possibly strike the female in the room due to her close proximity to the suicidal male. Officer Guadarrama fired his taser once to immobilize Mr. Olivas, hitting him in the torso. And shortly thereafter, Mr. Olivas was engulfed in flames and ran around the room causing it to be engulfed in flames. Mr. Olivas later died from his burns. Next, we are provided facts from Sergeant Jefferson's and then paragraphs 36 and following, we're provided Officer Elliott's account. And he was the other officer in the room. There are similar details he provides, but he does add some different perspectives from his vantage point. The plaintiffs hold him up as being more reasonable than Officer Guadarrama because Officer Elliott didn't fire his taser. But Officer Elliott confirmed that there are two or three family members in the bedroom, confirmed that Mr. Olivas poured gasoline on himself. Officer Elliott confirmed that he smelled the gasoline, as did Officer Guadarrama. And Officer Elliott heard Mr. Olivas screaming nonsense and yelling that he was going to burn the place down to the ground. Officer Elliott also observed Mr. Olivas holding a lighter. On paragraph 53, Officer Elliott is reported that he realized that the officers either had to find a way to incapacitate Mr. Olivas or evacuate the home. So that was the choice that was facing the officers. Interspersed among the plaintiff's factual pleadings are conclusory allegations that the plaintiffs have provided. But we're not to consider those. The court is to consider the factual pleadings. And in response to those pleadings, Officer Guadarrama filed his answer asserting qualified immunity and his motion to dismiss asserting qualified immunity. In response, the plaintiffs amended their complaint, and then Officer Guadarrama reasserted his motion to dismiss. The plaintiff, as this court knows about qualified immunity, the plaintiffs have the burden to allege facts. May I ask you a question at this point? Yes, sir. District Court denied the motion for qualified immunity. What reason did it give? Did it enter any written opinion? Or did it just simply say, this case needs further factual development? Is that all it said? That was all it said in the first order, but there were two orders. In the first order, that's what the court said. In the second order, which is, and I'm looking now at page 593 of the record, the court provided a paragraph and said that the plaintiffs had sufficiently pled facts to overcome the officer's complaint, page 7 and 44, to support that, as well as referring to the plaintiff's response to the motion to dismiss regarding whether or not there was clearly established law to deny it. And the district court never identified a disputed issue of material fact. That's correct, Your Honor. Okay. And so do we know then what the district court was referring to when it said it was, it needed further factual development? What further factual development, even in the most speculative kind of, of analysis would have been needed?  I think the complaint is over 50 something pages long and has over 100 paragraphs. I believe that the factual details provided are extensive and more detailed than most complaints. Was there any fact in the complaint alleged by the plaintiffs that you disputed? No, Your Honor. I didn't. All I did was take the facts from Guadaluama's perspective to show that one, he didn't violate clearly established law because there was no law asserted that Officer Guadaluama violated. And I think that's the second prong of qualified immunity. Right. And there's none of that. The point I'm obviously driving at is whether we have a jurisdiction of the qualified immunity ruling of the district court for the reason that the district court said, I am remanding it for further factual development. If he denied it on a basis of this material fact, then of course we don't have jurisdiction. That is not the case as I, there's no fact identified here as disputed. I would agree with that. That's correct, Your Honor. I'm asking, not questioning. Okay. Well, that's, that's, that's, I'll submit that's true. But what we have here is a question of law. And the question of law focuses on whether or not there was clearly established law that would have guided Officer Guadaluama in his actions about what to do or what not to do. And since there is none here, he was entitled to qualified immunity. I see that my time is up and I'll respond in rebuttal. All right. Thank you, sir. Mr. Levine. Levine, how do you pronounce it? Levine? You're muted. Your Honor, it's Levine. Okay. Thank you, sir. Thank you, Your Honor. May it please the court. My name is Scott Levine and I am honored today to represent Sergeant Ebony Jefferson and appear on his behalf today. In the time that I have been allotted, I hope to discuss three issues with the court. First, it is well established that Sergeant Jefferson was entitled to have the district court examine plaintiff's factual allegations relating specifically to his use of force separately, focusing on the moment that he allegedly used the force from his perspective in the circumstances that he confronted. The district court did not conduct such review. Based on the conduct that plaintiffs have alleged that Sergeant Jefferson engaged in, his conduct was objectively reasonable as two of the grand factors were clearly present. And according to the facts which plaintiff has alleged, Sergeant Jefferson's tasing occurred after Mr. Olivas had become engulfed in flames and therefore could not have caused him to become engulfed in flames. That's my first point. Second, as alleged by the plaintiffs, Sergeant Jefferson's conduct was objectively reasonable. And third, Sergeant Jefferson is entitled to qualified immunity unless the law has been clearly established as of July 10th, 2017, such that Sergeant Jefferson would have known that the particular conduct which the plaintiffs allege he has engaged in was unlawful. The matter was... May I ask you this question? What is the evidence with respect to the incendiary nature of the gun, of the stun gun? Did the officers know that if they fired that it would catch the gasoline, would ignite the gasoline? Your Honor, I think we must look at what facts plaintiffs have alleged. In this case, what plaintiffs have alleged was that Officer Elliott believed that to be the case. And further, what plaintiffs have alleged is that the officers should have known that tasing a suspect covered in gasoline carries with it a risk in that regard. Now, of course, we must weigh that with the obvious risk. And this is part of the, I think, the problem that plaintiffs' allegations run into, is that the plaintiffs have alleged that the defendant should have understood that there was some risk associated with the use of a taser. And in that regard, by doing so, and it is contained within their briefing, they admit then that what the officers were faced with was not just a risk, but the reasonable perception that there was a certainty that if they did not immobilize Mr. Olivas, that Mr. Olivas' lighter was certain to ignite the room, the family members and the officers in the room. And so while they have alleged... May I ask you this question? Yes, Your Honor. Is there any dispute, but that he had a lighter in his hand? Again, focusing on what the plaintiffs have alleged, they've alleged two things specifically. Number one, they have specifically alleged that in fact, he did have a lighter in his hands. And they have also alleged that it was immediately following the officer's realization that he was holding a lighter in his right hand, that Officer Guadarrama then instinctively tased Mr. Olivas in an effort to immobilize him. Now, to the point of Mr. Jefferson, Sergeant Jefferson, who's my client, it's important also to understand that in addition to the fact that the pleadings are different with respect to Officer Guadarrama and Officer Jefferson, with respect to Sergeant Jefferson, with respect to Sergeant Jefferson, specifically in paragraph 35 of the First Amendment complaint, which can be found at page 225 of the complaint, Sergeant Jefferson wrote that he heard a taser discharge from where Officer Guadarrama was standing. Further, upon hearing that discharge, the suicidal suspect immediately catches on fire, and I, meaning Sergeant Jefferson, became startled by the flames and moved away from them. Sergeant Jefferson then, upon information and belief, falsely asserts the plaintiff's say that he unintentionally discharged his taser, and Sergeant Jefferson pointed his taser at Mr. Olivas and intentionally shot him. So, back to my initial point, the plaintiffs in this case have alleged specifically that Sergeant Jefferson was in a different position than was Officer Guadarrama when Sergeant Jefferson fired his taser. The District Court failed to recognize that or consider the threat that was posed to Sergeant Jefferson and the circumstances at the moment he used force was slightly different than existed with Officer Guadarrama. Having said that, to be clear, both officers were clearly within the bounds of objective reasonableness to have fired the tasers when to immobilize the suspect. And in this instance, there was number one, a crime, a serious crime at foot, which was the threat of Mr. Olivas through arson burning down the home, a habitation with occupants in it, and two, obviously, and the pleading suggests this clearly, that the room was full with gas vapors, and the plaintiffs have pled that igniting those gas vapors was a threat to everyone in the room. So, in that instance, we have two Graham factors, which are both clearly demonstrated by the plaintiff's pleadings, which control the fact then at that point that the conduct was objectively reasonable. And the third point, and I think this is the overwhelming point that I would ask the court to consider, is that we are talking about a scenario in which a man has in a room, two family members and three officers, where the room is completely assumed by gas fumes, and poses an immediate threat to everyone in the room. When we look at that scenario, we have to ask ourselves, number one, is there a case which clearly establishes that the use of a taser under those circumstances would violate the Fourth Amendment? Even broader than that, do we have a case from this jurisdiction, which suggests that there is a particular level of force under those circumstances, where there's a serious crime afoot, where there is a immediate and deadly threat posed, not just to the person holding the lighter, but to family members and these officers, whether it be Sergeant Jefferson or Officer Guadarrama, would know in the blink of an eye in an instant, what the bounds of the Fourth Amendment says at that point. All right, Mr. Levine, your time has expired. I'll give you a declarative sentence to kind of summarize your point. I think I did, Your Honor. I appreciate it. Thank you. You good? Oh, okay. All right. All right. Thank you, sir. All right. Thank you, Your Honor. Please escort Bruce Thomas on behalf of Applebee's Linda Ramirez and her son, the plaintiffs below. Elliot said, if we tase him, he is going to light on fire. We allege and are pleading that the officers knew from not just that statement, but from their training and the big blazing figure on the PowerPoint presentation from their training that they knew to a certainty that if they fired their tasers, it was going to set Mr. Olivas on fire. When a subject is threatening to self immolate, the police should not provide the match. And that's exactly what Sergeant Guadarrama and Sergeant Jefferson, Officer Guadarrama did here. Mr. Thomas, what do you think that the officers should have done? Well, I think they should not have fired the tasers. Totally understand that. Secondly, it would have been prudent to have removed the family members by force if necessary, and then wait until the the crisis intervention team, all the crisis intervention team and or teams to arrive that had specialized weapons that they could use. If any weapons were necessary, they should not have immediately resorted to force. And they if they were going to resort to force, they should have provided warnings before resorting to force, but they should have provided, they should have engaged in negotiation, they should have attempted a physical force if necessary, if they thought they could do so safely, and measured and ascending actions before immediately resorting to force. And therein, I'm sorry, I'm just going to ask, do you have a case that suggests that we need to, that the Fourth Amendment requires officers to negotiate with a man who's doused himself in gasoline, and is threatening to light himself on fire? Well, not with that micro precision. But I think the Carson case that we cite is pretty similar. And the cases that it relies on to establish clearly established law where where the suicidal suspect is holding a gun to his head. And just like Mr. Ortega could do at any time, he could flip the gun and start firing the gun at the schoolchildren that the officers said that they were trying to protect. Now we got plenty of cases that say that it's unreasonable to use force without warnings. And it's unreasonable to use force when there's no immediate threat of danger. I'm looking here at your brief on pages 38 and 39. It doesn't say anything about crisis management or negotiation. What we did, I'm sorry, can I just this, I would like to do a sentence and I'd like to understand what you're saying. This is this is from your brief of plaintiffs allege the OC spray, the pepper spray that that I believe it was it was officer Elliott used, was quite effective in blinding Mr. Hollifuss and causing to rub his hands over his eyes, at which point officer Elliott and defendants could have easily rushed Mr. Hollifuss and physically subdued him without using deadly force. So in your answer to my first question, I didn't hear you suggest that the Fourth Amendment requires officers to rush a man covered in gasoline threatening to light himself on fire. Well, we don't say the Fourth Amendment requires them to rush rush him. But that was yet another option that they had available. And yes, we say both of those in our brief that one option they had available to them was to call the crisis name. Another option was when he was blinded, and rubbing his eyes and distracted that they believe what we said he could either have taken the opportunity to remove the family members, or they could have easily rushed him at that point. But we don't have a case that suggests that the proper respect. And again, we're talking about the Fourth Amendment of the Constitution, right? So it's your burden as plaintiff to show us that the Fourth Amendment requires the officers to do something different than what they did. And I didn't see any cases here that talk one way or the other about officers being required to rush a man covered in gasoline holding a lighter. Well, we're not we're not saying that the officers are required to rush a suspect holding a lighter. We're saying that officers were required not to use tasers in that circumstance that were that were equivalent to using deadly force because they weren't under imminent threat at the point in time they use the tasers. In fact, the officers never give us any objectively reasonable explanation for why they fired the tasers at the time at Mr. Ortega at the time they did, and never give any explanation. And where we are at loggerheads on the facts, to get back to the earlier question, is the attorneys for the defendants want you to infer that they fired the tasers because they were in fear of their lives or in fear of the lives of others. But that's not how they acted. And it's not what they said at the time, in response to investigators and in their written statements. So we're saying we allege that there was no immediate threat at the time that they fired. What did they say to the investigators and at the immediate time? How did they explain their conduct? Mr. Sergeant Jefferson doesn't explain his conduct and firing the taser at Mr. Ortega at all, because he denies that he ever fired his taser at Mr. Ortega. He claims that first he claimed that he did not target it. Then he told the investigator, well, he targeted it, but he didn't fire it. And then, and I tells a third story in a written statement later where he says, well, yes, he targeted his taser, but he waited and delayed until Guadarrama fired, and was startled, dropped it, taser somehow went off, prongs went back up in the air, and somehow managed to hit Mr. Olivas right exactly where, in the chest where he had been targeting Mr. Olivas before his fire. I'm sorry? What did Guadarrama say? Guadarrama said, first said that the family members were at a safe distance. They were a safe distance away. And we think at least that part of the statement was correct. Because once the officers started the fire, neither the officers nor the family members were burned. He then later says as the way he fired his taser, he just says he fired it instinctively, which is the opposite of having a rational explanation for why he fired his taser. He does not say... When did the when did the lighter come into the picture? We allege that they first saw the lighter after they used pepper spray. And, and Mr. Olivas was rubbing his eyes and distracted. And that's when they, they, they first saw the lighter. That's what we allege. And was the, was the pepper spray, I mean, was the stun gun absolutely certain to have an incendiary effect on the gas? Or was that a probability or possibility or what? We allege that the officers knew to a certainty that that was going to happen. That is the way Mr. That is the way Officer Elliot phrased it. He said, if we tase him, he is going to light on fire. So I understand that. But it was that, is that a fact that occurs every time that a taser contacts with gasoline or some other explosive matter? I, we don't, we don't, I think that would be the subject of further factual development, discovery, and expert opinion. But we, what we allege is that they are, they are trained that fires can be caused by using a taser with gasoline vapors and that, and that they knew that this was going to happen, or at least very likely to happen. So Jefferson gives no explanation, I'm sorry. To ask, to bring the situation to some perspective, what do you say about the choice that the officers had, assuming they knew that there was a probability of, of the taser lighting the gas, when the, when the deceased, the victim, had a lighter in his hand, that reasonably could have been assumed to create the same condition? We say that How do you analyze that choice? I mean, should they let him, should they, if they just let him do it? Yes. Well, Turned around and run and just says, you know, do it yourself. What, what kind of position does that put the police in? Well, it puts the police in a position first to do no harm. We allege that Mr. Ortega never really That's what you're saying. They should do no harm, let him harm himself. Well, they should, they should attempt to follow the procedures with having the crisis management team come in. I think there's an implicit assumption that they don't have time to do anything. That is certainly what the defendants say. We allege the opposite. We, we allege, for example, Sergeant Jefferson says Okay. The understanding, the man has a lighter. He's been threatening to light himself up. He's doused himself with gasoline for the next time, for the last time again. And he has a lighter in his hand. And one, I guess, reasonably assumes that that lighter would be put to use. I mean, it just seems to me that there was just a situation in which there were just no good choices of any kind to resolve the situation. Well, Your Honor, I disagree, because we specifically allege that Mr. Ortega's threat was hollow, that he was not going to go through it. And one of the main thing that we point to, and that is once Officer Elliott pepper sprays him, if there was any time that would upset him to think that he would go ahead and make good on his threat, it would be after being pepper sprayed. In fact, he doesn't even pour gasoline on himself until Officer Elliott starts shaking the pepper spray. That's what causes him to douse himself with gasoline. And then after Elliott sprays him with pepper spray, and stops, he doesn't make good on his threat. At that point, he's distracted. He's rubbing his eyes. And there's an opportunity there, as there was an opportunity originally, to remove the family members, if they're not already at a safe distance to take them out of the house and call a crisis management team. That's what we allege, or to Russia, to go back to Judge Odom's point. If because officers are trained, and they, the example we use is the 21 foot rule, that we don't admit that that is a necessarily a good rule. We give this as an example for how officers are trained in reaction time, they're trained that a suspect has a knife or a club coming at them, that a suspect can close 21 feet in a second and a half. And before the officer has time to pull their service weapon. And because they knew that, they that was the situation here, because they already had their weapons out. And, and Mr. Ortega did not have a club or a knife, we're saying we're using the reaction time. We're making the reaction time point, if, if a suspect can close 21 feet in a second and a half, then these officers could have easily closed six to eight feet, and a very short period of time why Mr. Ortega was distracted and rubbing his eyes. I'm not saying that they had to do that. I'm just saying that that is one of the options that they had available to themselves. If they didn't think that that they thought that was too risky of an option, then their other option was to remove from the premises. That's exactly what Officer Elliott said, that they had, he thought they had to either immobilize them, apparently, from Officer Elliott's point of view, and mobilize them using some method other than using a taser because Officer Elliott had holstered his taser, because it wasn't reasonable to use it in the presence of gasoline fumes and shouted his warning. And he said their other option was to leave and to leave the premises and to come up with an alternate plan. But do you think would be a little unfair to the police on the scene to Monday morning quarterback, this tense situation that we now have the opportunity to do? I mean, I would very much disagree that we're Monday morning quarterback, because the officers were because the way the officers acted, they acted as if they were a safe distance from Mr. Olivas. It wouldn't make sense for the officers to fire their tasers, knowing that they were going to set off a fire are very likely to set off a fire if they really believed they were within distance of being burned. And Mr. Ortega set off the fire. If it doesn't make any sense that they leave the family members there and don't remove them by force, if they really believe the family members were going to be burned with Mr. Ortega set off the fire. They had an opportunity to remove them. And it seems that they could have easily done so I'm sorry. That did they have the opportunity to remove the family members when all this other was going on? Yes, sir. The first thing Sergeant Jefferson says, and his statement is that he tried to remove the family members by force but failed. Okay, the others, the other two officers said they yelled at them to leave and they originally left and came back. Now, we say that Sergeant Jefferson's explanation is not believable. Because three officers, if they really wanted to, could remove a small five foot one woman and a boy from the household, if they really believe that they were in danger. But in fact, they asked if those three officers were focused on removing the family members, how many officers would have been left to guard the man covering gasoline holding a lighter? They, Your Honor, they I'm not sure what the answer to the question is. But I think I think if they needed to fit two officers to remove the family members, that would have certainly left one officer there. There were two other officers immediately coming up that had been called to the premises. There was no reason to immediately resort to force before they had backup and other officers there. There was no imminent threat right at that time. And as the seconds passed, and they had to adjust to those seconds, it looked more and more like a hollow threat that Mr. Ortega was ever going to make good on his suicide threat, when Officer Elliott had pepper sprayed him and not even that, although it caused him to douse himself in gasoline, that had not caused him to carry good on his threat. As time went on, this looked more and more like a hollow threat. And they had the Mr. Ortega was blinded to remove the family members, if that's what they thought needed to be done to make them safe. But again, what a Rama is saying in his statement, the only statement that addresses it, that the family members were at a safe distance, a safe distance away. And we believe that ends up being proven correct. Because when the fire starts, the family members aren't burned. Apparently, they're actually behind the officers, because the only harm other than the death of Mr. Ortega, is that when the officers turn around and flee after starting the fire, they run over Mr. Ramirez and injure her knee in the process. I want to take the opportunity to very much say, we very much dispute that there's that we have pleaded that Officer Jefferson fired after the fire started. That is not at all what we're pleading. That is an inference that the defendant's attorney is asking to make that nowhere in our pleading do we say he fired after the fire started. What we specifically plead is that these officers acted together. And the ultimate fact that proves that from our perspective is two lasers are targeted on Mr. Levi's chest. And 15 minutes later after the fire, four probes are pulled from the chest by the paramedics. Two are from Officer Jefferson's gun and two are from Officer Guadarrama's gun. The only way that can happen, the only way that can happen is that officers both fired before the fire started. It is an embellishment of facts and unreasonable inference based upon attempting to impose a false chronological order on what we're pleading that Jefferson fired after the fire started. That's not at all what we're saying. And it's not a conclusion. When we say and I think of paragraph 54, that the officers together approximately caused the fire, we have said it again in paragraph nine and paragraph 35. We say the officers plural caused the fire and both paragraphs we say again and paragraph 54 and paragraph 68. And in paragraph nine, in fact, we specifically disclaim that we are pleading in chronological order. Clearly, we're not. We go from statement to statement and back and forth to compare the statements and what and to compare what the defendant said to investigators versus what they said in their statements. So what we were saying in paragraph 35 that they want to take out of context is that we are disputing the entire story about waiting to fire and not and then dropping the taser and then the tasers going off like a guided missile and finding Mr. Guadarrama as he's running around the room. None of that happened. That's not what they told the investigator. And that's not what we're looking. All right, your time is gone. Judge Olem, you got a follow up for him? Oh, okay. Judge Jolly, any additional questions for Mr. Thomas? Thank you, sir. No. All right. Thank you, Mr. Thomas. Sorry, we go back to Mr. Voss. You've got rebuttal, whatever you can say in two minutes. Well, I'll thank your honor. I'll do the best I can. Obviously, I won't be able to address everything that was just stated by Mr. Thomas. But I do want to point out in follow up to one of the questions that it is Officer Guadarrama's position that at these allegations by the plaintiffs amount to 20-20 hindsight and second guessing, because even though the events unfolded quickly, plaintiffs argue simply that the situation could have been handled better. But that's not the standard. The question is not whether Officer Guadarrama chose correctly  The question in the qualified immunity analysis is whether Officer Guadarrama's actions were reasonable. There's no allegation that Officer Guadarrama had a duty to flee the house or to leave the house. There is no such duty. There is no case law cited. And that is true here in these facts when there were other people in the room with Mr. Olivas, who had doused himself with gasoline and had a lighter. I think if you go back to the very beginning of the allegations in paragraph 12, the danger of this is evident in the allegations that Mr. Olivas was at home, and he was threatening to light himself on fire after dousing himself with gasoline. That in and of itself is a dangerous situation that was facing the officers. And so the officers responded, Officer Guadarrama tried to immobilize him. And unfortunately, it caused a fire. And that fire tragically resulted in Mr. Olivas' death. But that's the kind of judgment call that qualified immunity is designed to address and to protect officers who are faced with such a difficult decision under these circumstances. Thank you. All right. Thank you, sir. Mr. Levine. Briefly in rebuttal, Your Honor, I would like to raise three quick points. First of all, in answer to one of the questions that was posed on page 242 of the record, paragraph 84, what is trained and what the plaintiffs allege is that a taser can ignite explosive materials, can. And so what we've got here, and I'm loathe to engage in it, because the Fifth Circuit and the Supreme Court had both said, we ought not do this, is when we look at the situation the officers face, the only, even in hindsight, if they had used a gun, a gun causes a flash, that has a potential. The only possible mechanism to immobilize this man from lighting a lighter, which was certainly going to engage the gas fumes in the room, was a taser, was to immobilize him. And while there was a risk that carried with it, that is a decision under the circumstances that the officers had to make, it was reasonable to make, and at this point, is not subject to 20-20 hindsight or second guessing, especially in an instance when there are no solutions that even sitting here today we can come up with that would be better. I was before this court a decade ago in Rockwell v. Brown, and we talked about two different things. One is the Fifth Circuit does not recognize the state-created need there. We focus on the moment that the force is used, nor do we look at the other alternatives that weren't used. What we examined is what the officers did. In Salas v. Carpenter, 980 F. 2nd, 299, this court said that while we understand that folks are arguing that you should have called the SWAT team in, you should have called the crisis negotiator, you don't have a constitutional right for those things. What we do is to examine the force that was used at the moment it was used. And under these circumstances, the force was reasonable, and there simply is no case law to suggest that, even remotely, that it was clearly established that these officers should have known that the attempt they were making to immobilize the subject was a misdemeanor. Thank you for your time. All right, counsel for your briefing and for responding to the court's questions and helping us out. These are difficult cases, but we'll get it decided as quickly as we can. The three of you are excused from these proceedings.